## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DIANA KARTHAUSER**, | Case No. 3:20-cv-127-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **COLUMBIA 9-1-1 COMMUNICATIONS DISTRICT**, | |
| Defendant. | |

Stephen L. Brischetto, LAW OFFICE OF STEPHEN L. BRISCHETTO, 621 SW Morrison Street, Suite 1025, Portland, Oregon 97205; and Matthew C. Ellis, LAW OFFICE OF MATTHEW C. ELLIS, 621 SW Morrison Street, Suite 1025, Portland, Oregon 97205. Of Attorneys for Plaintiff.

Karen M. O'Kasey and Andrew T. Weiner, HART WAGNER LLP, 1000 SW Broadway, Suite 2000, Portland, Oregon 97205. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Diana Karthauser (Karthauser) asserts claims against Defendant Columbia 9-1-1 Communications District (C911) under both federal and Oregon law, alleging sex discrimination, retaliation for opposing sex discrimination, whistleblower retaliation, violation of social media account privacy, wrongful discharge, and violation of the Equal Protection Clause of the Fourteenth Amendment. Before the Court is C911's motion for summary judgment on all claims. For the reasons discussed below, the Court grants in part and denies in part C911's motion.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

Karthauser is a former employee of C911, which is the 9-1-1 dispatch center for public safety agencies in Columbia County, Oregon. She was employed by C911 from March 2000 until C911 terminated her employment on July 16, 2018. During her 18 years of employment, Karthauser was promoted to managerial positions and received recognition of good performance, including Employee of the Year in 2005 and positive performance reviews. Her coworkers nominated her for a Certificate of Achievement in August 2017.

Between 2014 and 2018, a series of vacancies and organizational restructuring caused Karthauser and her coworkers to change positions several times. Karthauser was promoted from Supervisor to Lead Dispatcher to Performance Manager. Her coworker Trish Hilsinger was

promoted to Operations Manager and the former Operations Manager Steve Watson was promoted to Executive Director. Watson started as Executive Director in January 2016.

In January 2017, C911 began investigating Watson for sexual harassment. As part of the investigation, C911 retained attorney Liani Reeves of the law firm Bullard Law to interview employees who had worked with Watson, including Karthauser, and recommend whether C911 should continue Watson's employment. Reeves detailed her findings and recommendations in a 44-page report (the Reeves Report) to C911's Board of Directors (Board). In her report, Reeves discussed the nature of Watson's relationships with two employees, Hilsinger and Cindi Turula, and included Karthauser's comments that Watson had previously asked her out. Also in her report, Reeves recommended that the Board dismiss Watson from his position as Executive Director. Watson later confronted Karthauser about her participation in Reeves's investigation.

C911 also retained attorney Akin Blitz, also of Bullard Law, to investigate Tyler Miller, a deputy sheriff for Columbia County and a volunteer at C911, who had accused Watson of having inappropriate relationships with female employees. Blitz detailed his findings and recommendations in a 31-page report (the Blitz Report) to C911's Board. In his report, Blitz concluded that there were serious concerns about Tyler Miller. Blitz sent a copy of his report to both the Sheriff and the Oregon State Police, and Blitz met with two State troopers in the Bullard Law office. The Board referred Miller for criminal prosecution. The District Attorney, however, declined to prosecute Miller, concluding that Miller did not engage in criminal activity by reporting Watson's sexual misconduct.

Watson resigned his position during at an executive session of the Board in April 2017, after the Board decided not to terminate Watson if he agreed to resign. On the day of his resignation, Watson called Karthauser into his office and said that he was angry with her for

participating in Reeves's investigation and that her disclosures made him look like a liar. Blitz did not recommend referring Watson for criminal prosecution, opining that it would be an "extraordinary circumstance" to prosecute as official misconduct such "run-of-the-mill/garden-variety . . . sexual harassment misconduct."

C911 replaced Watson with Brian Burright as interim Executive Director. A year later, in April 2018, C911 selected Mike Fletcher to be its new Executive Director. Fletcher started as Executive Director on April 19, 2018.

Fletcher has known Watson since about 2012, and the two have interacted regularly in work and non-work contexts. They have met for dinner outside of work several times and met for lunch several dozen times. They also refer to each other as "good friend" or "my man" in text messages. Fletcher considers Watson a "friend," but not a "close friend." They have never been to the other's home.

On May 1, 2018, C911 employee Jason McClafferty reset Karthauser's password credentials for the Criminal Justice Information System (CJIS) and accessed Karthauser's CJIS account. At the time, Karthauser was the sole district employee who had a CJIS administrator account for C911. Karthauser reported McClafferty's actions to Fletcher that day. Fletcher recognized that Karthauser was raising allegations that, if true, could result in criminal charges being brought against McClafferty or C911 and expose C911 to discipline by the State or the FBI that could "cripple" C911. According to Blitz, accessing Karthauser's individual account would be a "federal crime." Fletcher addressed this "serious issue" by meeting with McClafferty and counseling him that his unauthorized access was not "appropriate."

After an all-staff meeting on May 30, 2018, a dispatcher approached Fletcher in his office and asked to speak with him in confidence. She claimed to be acting as a "spokesperson" for

other dispatch staff about grievances they had about Karthauser and requested an off-site meeting to address staff concerns. Fletcher reached out to Blitz the next day to advise him of the upcoming meeting and Fletcher's understanding and suspicion of a possible serious personnel matter.

Fletcher met with Watson on the morning of June 6, 2018. At noon that same day, Fletcher met with the dispatchers. At this meeting, six dispatchers reported that Karthauser had bullied and intimidated employees, revealed employees' confidential medical information, and had not adequately trained employees on the new protocols for responding to medical calls, which was Karthauser's responsibility. Records from Oregon's Department of Public Safety Standards & Training showed, contrary to what the dispatchers reported, that they were all fully trained.

After the meeting, on June 6 and 7, 2018, Fletcher contacted the Board's personnel committee, Rob Anderson and Henry Heimuller. Fletcher told Anderson and Heimuller of his intent to put Karthauser on administrative leave while C911 investigates. The two Board members agreed. Fletcher also began an audit of the training records and hired an outside investigator, Jason Servo, to investigate Karthauser's conduct, including whether she falsified training records. Blitz, who had not met Servo before, directed the investigation and instructed Servo not to interview Karthauser because he did not want to give Karthauser immunity from criminal prosecution. Servo wanted to interview Karthauser but felt that Blitz was "on a road to get the DA and State Police on board." The relationship between Servo and Blitz became contentious, and Blitz took over the preparation of the final investigation and report.

On June 8, 2018, Karthauser received notification from Facebook that a request to change her Facebook password had been made. Karthauser suspected that McClafferty had attempted to

access her Facebook account, and Karthauser reported her suspicion to C911 employee Nancy Edwards.[1]

Three days later, on June 11, 2018, C911 placed Karthauser on administrative leave. Fletcher gave Karthauser a letter stating that there were serious allegations against her but giving no further details about why she was being placed on leave or what the investigation was about. Karthauser did not know why she had been placed on leave.

C911 terminated Karthauser's employment on July 16, 2018. C911 told Karthauser that her employment was being terminated because she had inappropriately signed off on training records of subordinates who had not completed the required training. Karthauser believes that Burright had authorized the manner in which Karthauser performed the employee training. Others who took part in the same conduct were not disciplined or terminated.

Blitz referred Karthauser to criminal prosecution by forwarding the investigative reports to the district attorney and meeting with Oregon State Police detectives. At least some Board members, including Heimuller, agreed with the decision to refer Karthauser for criminal prosecution. Fletcher emailed C911 staff on August 1, 2018, to provide an update on Karthauser's departure, the Oregon State Police investigation, and staff participation in the investigation. Fletcher forwarded this email to Watson four minutes later, advising Watson that Fletcher had suggested to the detective that there may be "some interest in him speaking with [Watson] to cover any issues or pertinent things that may be germane to this investigation." Brischetto Decl., Ex 19.

---

[1] C911 contends that the notification involved McClafferty attempting to access C911's Facebook account. The Court, however, views the facts in the light most favorable to Karthauser, who contends that it was her personal Facebook account. The documentary evidence on this point is ambiguous.

Karthauser was later indicted, and in September 2020, she pleaded guilty to one count of Official Misconduct in the Second Degree, a misdemeanor, admitting that she had submitted an official document containing false information. After Karthauser met the terms of her diversion agreement, all charges against her were dismissed and her conviction expunged.

## DISCUSSION

### A.  Sex Discrimination

In her First Claim for Relief, Karthauser asserts federal and state discrimination claims under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(a)) and Oregon Revised Statutes (ORS) § 659A.030(1)(a). These claims are based on allegations that C911 discriminated against Karthauser because of her sex.

#### 1.   Title VII Discrimination and ORS § 659A.030

Title VII prohibits "discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). An employer violates Title VII by, among other things, offering terms or conditions of work to employees of one sex that are less favorable than those the employer offers to employees of another sex. *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). Examples include refusing to hire, paying less for the same work, imposing more onerous duties for the same pay, or otherwise permitting less favorable working conditions, based on sex. *Id.* Because Oregon based ORS § 659A.030 on Title VII, courts analyze the claims together. *See Dawson v. Entek Int'l*, 630 F.3d 928, 935 (9th Cir. 2011) (holding that federal burden-shifting framework applies to Oregon discrimination claims); *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1437 n.2 (9th Cir. 1993) (stating that courts construe ORS § 659.030 as "identical to" Title VII (gathering cases)).

Under the applicable federal burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). A plaintiff may do so either by direct evidence of discriminatory intent or on a presumption arising from the *McDonnell Douglas* factors. *Wallis v. J.R. Simplot Co.* 26 F.3d 885, 889 (9th Cir. 1994). A plaintiff may establish a prima facie case of discrimination indirectly by showing that: (1) she is a member of a protected class; (2) she was performing the job satisfactorily; (3) she suffered some adverse employment consequence; and (4) similarly situated individuals outside of her protected class were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802; *Weil v. Citizens Telecom Services Co., LLC*, 922 F.3d 993, 1003 (9th Cir. 2019). "The requisite level of proof necessary to establish a prima facie case for Title VII . . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis,* 26 F.3d at 889.

After a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant shows a nondiscriminatory reason, the burden returns to the plaintiff to show that the defendant's nondiscriminatory reason is mere pretext. *Id.* at 804.

A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive."). "[W]hen the plaintiff relies on circumstantial evidence, that evidence must

be specific and substantial to defeat the employer's motion for summary judgment." *Coghlan v. American Seafoods Co. LLC*, 413 F.3d 1090, 1095-96 (9th Cir. 2005) (quotation marks omitted). "However, that requirement is tempered by [the Ninth Circuit's] observation that, in the context of Title VII claims, the burden on plaintiffs to raise a triable issue of fact as to pretext is 'hardly an onerous one.'" *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007) (quoting *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997)).

Although a plaintiff's burden is higher to show pretext than to prove a prima facie case, "[t]he same evidence can be used to establish a prima facie case *and* to create a genuine issue regarding whether the employer's explanations are pretextual." *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 870 (9th Cir. 1996) (emphasis in original); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000) (explaining that plaintiffs "may rely on the same evidence they used to establish a prima facie case or put forth additional evidence"); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 732 (9th Cir. 1986) ("To show pretext, the plaintiff is not necessarily required to introduce evidence beyond that already offered to establish her prima facie case, although she may of course provide additional proof of the defendants' unlawful motivation."). Finally, "[a]s a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quotation marks omitted).

### 2. Application

#### a. Prima Facie Discrimination[2]

Karthauser asserts two adverse employment actions that she contends were discriminatory: C911 terminating her employment and referring her for criminal prosecution. It is undisputed that C911 terminated Karthauser's employment and referred her for prosecution and that sex is a class protected by Title VII, satisfying the first and third elements of a prima facie case. C911, however, contends that Karthauser does not offer proof that she was performing her job satisfactorily or that similarly situated male employees were treated more favorably.

#### i. Satisfactory job performance

On the second element of a prima facie case, satisfactory job performance, the Ninth Circuit requires only a minimal standard.[3] *See Douglas v. Anderson*, 656 F.2d 528, 533 n.5 (9th Cir. 1981) ("In establishing a prima facie case, [plaintiff] need only produce substantial evidence of satisfactory job performance sufficient to create a jury question on this issue."). Under the circumstances of this case, C911's evidence of unsatisfactory job performance is properly considered in C911's rebuttal as a legitimate nondiscriminatory reason for its action, not before.

---

[2] Karthauser asks the Court to follow *Brady v. Office of the Seargent at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008), and jump to the issue of pretext rather than addressing the elements of the prima facie case of discrimination. Karthauser cites no cases in the Ninth Circuit following *Brady*, and this Court declines to do so because C911 contends that Karthauser fails to meet her burden of showing a prima facie case of discrimination.

[3] C911 relies on a standard of satisfactory job performance *at the time* of discharge, which is not supported by Ninth Circuit precedent. The case cited by C911 is distinguishable because it involved an alleged discriminatory *promotion*, not discharge. *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217 (9th Cir. 1998). Further, the court summarized without discussion that the plaintiff "unquestionably established" her prima facie case, including that "she was performing according to her employer's legitimate expectations," without any reference as to time. *Id.* at 1220.

*See id.* at 533 n.5 & 533-35 (holding that the plaintiff had established a prima facie case even though the defendant, on rebuttal, showed that the plaintiff's job performance had been unsatisfactory prior to his termination and the plaintiff was unable to show pretext); *see also Decker v. Barrick Goldstrike Mines, Inc.*, 645 F. App'x 565, 567 (9th Cir. 2016) (holding that the trial court misapplied the *McDonnell-Douglas* framework by "confusing the minimal showing a plaintiff must make at the prima facie stage with the more substantial showing required at the pretext stage," reviewing the plaintiff's "unblemished" "eighteen-year tenure" with the company in considering satisfactory job performance, and concluding that the plaintiff had satisfied his minimal burden to present a prima facie case, although the plaintiff ultimately failed to show that the employer's legitimate reason of unsatisfactory job performance was pretext); *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 659-60 (9th Cir. 2002) (same).

The circumstances in which a plaintiff fails to meet the minimal prima facie burden may include when the employee's job performance was steadily declining or that the employee previously had been placed on a performance improvement plan. *See Weil*, 922 F.3d at 1004. The evidence here does not show any such performance issues. To the contrary, Karthauser provides multiple examples of performance awards and recognition from 2005, when she was employee of the year, until 2017, when she was nominated for a Certificate of Achievement. Additionally, Karthauser's performance reviews were overwhelmingly positive. Like the plaintiffs in *Douglas*, *Decker*, and *Aragon*, Karthauser has met her minimal prima facie burden of proving satisfactory job performance. The evidence of misconduct presented by C911 is properly evaluated as its legitimate, nondiscriminatory reason, and then considered for pretext.

### ii.  Similarly situated employee

For the fourth element of her prima facie case, Karthauser must produce evidence of a similarly situated employee who displayed similar conduct but was treated differently. *Weil*, 922 F.3d at 1004. "It is not enough for employees to be in similar employment positions; rather, the plaintiff and the comparator employee must be similarly situated in all material respects." *Id.* (cleaned up). Employees are similarly situated if they have "similar jobs and display similar conduct." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).

The standard at the prima facie stage, however, requires only a minimal showing to establish that co-workers were similarly situated. *See Aragon*, 292 F.3d at 660. "Even though a comparison to 'similarly situated' individuals may be relevant both to plaintiffs' prima facie case and proof of pretext, these inquiries constitute distinct stages . . . . [A] plaintiff's burden is much less at the prima facie stage than at the pretext stage." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010); *see also Aragon*, 292 F.3d at 659 ("The district court's analysis seems to conflate the minimal inference needed to establish a prima facie case with the specific, substantial showing Aragon must make at the third stage of the *McDonnell Douglas* inquiry to demonstrate that Republic's reasons for laying him off were pretextual.").

Viewing the record in the light most favorable to Karthauser, she has met her minimal burden of showing that similarly situated employees outside of her protected class received more favorable treatment. Karthauser provides evidence that a man, McClafferty, was given more favorable treatment than Karthauser under C911's employment policies. Fletcher received reports concerning both McClafferty and Karthauser that he thought raised issues of serious misconduct. Fletcher later received additional complaints about McClafferty of bullying, sexism, and condescending and belittling behavior. Yet Fletcher administered progressive discipline to McClafferty for all complaints. Karthauser also presents evidence that when Watson, a man, was

accused of sexual misconduct, Watson was not placed on administrative leave during his investigation and was able to tell his side of the story. Neither McClafferty nor Watson were referred for criminal prosecution for their misconduct. Karthauser's evidence of different treatment of McClafferty and Watson compared to Karthauser satisfies the fourth element of her prima facie case.

### b. Legitimate, Non-Discriminatory Reason for Adverse Employment Actions

C911 presents evidence that Fletcher terminated Karthauser's employment because she mistreated subordinates, failed properly to train dispatchers, and falsified training records. C911 presents evidence that she was referred for prosecution because the falsified training records constitute a violation of law. C911 has met its burden of offering a legitimate, nondiscriminatory reason for the asserted adverse employment actions.

### c. Pretext

Karthauser offers the following arguments for why the reasons C911 offers are pretextual: (1) the reasons "lack credence";[4] (2) C911 did not follow its usual disciplinary procedures in her termination and had an "overstated" response; (3) Karthauser had a history of good performance; (4) similarly situated employees were treated differently regarding both

---

[4] Generally, showing that an employers' reasons are "unworthy of credence" is the indirect method of proving pretext, and can be shown through various arguments and circumstantial evidence. *See Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1280 (9th Cir. 2017) ("An employee can prove pretext either: (1) directly, by showing that unlawful discrimination more likely motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable."). Karthauser, however, raises "lack of credence" as one of five arguments as to how she indirectly proves pretext (or that C911's reasons are "unworthy of credence"). Thus the Court addresses this argument separately, as framed by Karthauser.

termination of employment and referral for criminal prosecution; and (5) the Oregon Bureau of Labor & Industries (BOLI) found "substantial evidence" of discrimination and retaliation.

On the first point, Karthauser denies that she bullied employees, failed properly to train dispatchers, or falsified training records. She asserts that the bullying and hostile workplace allegations conflict with the August 2017 Certificate of Achievement for which she was nominated by staff. She explains how she created her training plan in good faith, replicating how she was trained, and designed the plan to bring dispatchers up to speed on a new system under budgetary and personnel constraints. She adds that Burright, Fletcher's predecessor, had accepted her plan. Dispatchers began using the new system on April 1, 2018, and in the more than two months after their transition, there were no issues brought to Karthauser's attention of any significant problems with her training. Karthauser describes her false statements on the training records as an "innocent mistake" caused by misremembering the amount (or quantified value) of the training she provided as 40, not 32, hours.

The Ninth Circuit, however, evaluates pretext subjectively. The relevant question is not whether the decisionmaker based his or her termination decision on an *objectively* false" version of an employee's conduct, but whether the decisionmaker "honestly believed" the reasons given for the termination of employment. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (emphasis in original). Provided the decisionmaker honestly believed those reasons, they are not pretextual even if they were "foolish or trivial or even baseless." *Id.* (quotation marks omitted); *see also Kelly v. Boeing Co.*, 400 F. Supp. 3d 1093, 1099 (D. Or. 2019) (holding that a plaintiff could not create a question of fact about pretext even if the company's report about an employee's tampering with a urine sample was based on a "mistake or misunderstanding"). Construing the facts in the light most favorable to Karthauser,

the Court accepts that some of the evidence of Fletcher's potential retaliatory motive, discussed *infra*, could indicate that Fletcher may not have had a good-faith belief in his stated rationale for terminating Karthauser's employment. This evidence, discussed further in Section B on retaliation, is some support for a finding of pretext.

More persuasive is Karthauser's evidence that C911 did not follow its typical disciplinary procedures in her case and gave similarly situated men more lenient treatment. An employer's disregard for its own company policies, or failure to follow its normal practices, is evidence of pretext. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1117 (9th Cir. 2011) ("A plaintiff may also raise a triable issue of pretext through evidence that an employer's deviation from established policy or practice worked to her disadvantage."); *Diaz v. Eagle Produce, Ltd.*, 521 F.3d 1201, 1214 (9th Cir. 2008) (holding that reasonable jurors could conclude that deviating from company policy "undermines the credibility of the proffered explanations"). Additionally, "[a] showing that [the employer] treated similarly situated employees outside [the plaintiff's] protected class more favorably would be probative of pretext." *Vasquez*, 349 F.3d at 641. Employees "need not be identical" to qualify as similarly situated; they must simply be "similar in material respects." *Earl*, 658 F.3d at 1114. "Materiality depends on the context and is a question of fact that cannot be mechanically resolved." *Id.* at 1114.

Karthauser presents specific and substantial evidence that C911 did not follow its typical disciplinary policies in four ways. First, C911 did not obtain and provide Karthauser with a copy of the investigator's report, as required under its investigation policies. Second, C911 did not give Karthauser at least five days' notice of the proposed termination of employment or even "adequate time to develop a response and to seek necessary outside assistance" because Fletcher notified and fired Karthauser on the same day, July 16, 2018. The notice letter was dated July

13th, and it proposed a final meeting on July 18th. Karthauser argues that the dates in the letter are admissions that C911 intentionally breached its disciplinary policies. Third, C911 did not undertake progressive discipline, which the policy encourages "when appropriate," and fired Karthauser without hearing her side of the story. Fourth, Fletcher did not inform Karthauser of her right to appeal to the Board and discouraged her from doing so by stating that the full Board already agreed with his decision.

C911 disputes the extent to which these disciplinary policies are required or typical and argues that it did adequately follow its obligations, including asserting at oral argument that it provided Karthauser with notice when it put on her administrative leave. Karthauser disputes that she was given adequate information at the time she was put on leave, and the Court views the facts in the light most favorable to the non-moving party. C911's other responses merely present factual disputes. To the extent the parties disagree and offer evidence to support their divergent positions, a jury must resolve those disputes. *See Anderson*, 477 U.S. at 255.

Karthauser also offers specific and substantial evidence that her disciplinary experience diverges from and was more extreme than that of her similarly situated male colleagues who also were suspected of illegal behavior. As previously discussed, McClafferty received progressive discipline after committing what Fletcher identified as an "illegal" act. Also, Watson was not placed on administrative leave after he was accused of unlawful sexual harassment. Instead, he was thoroughly investigated, presented with the results of the investigation, and allowed to resign. Further, C911 did not refer either McClafferty or Watson for criminal prosecution.

C911 also challenges that Karthauser is similarly situated to either Watson or McClafferty, arguing that she is not. Whether employees are similarly situated is ordinarily a question of fact. *Beck v. United Food & Commercial Workers Union Loc. 99*, 506 F.3d 874, 885

n.5 (9th Cir. 2007). The evidence that these two men, like Karthauser, were accused of committing potentially illegal acts but were given more lenient disciplinary treatment that was a closer fit to C911's stated policies is sufficient to create an issue of fact for the jury.

In arguing that Watson was not similarly situated to Karthauser, C911 states that Karthauser and Watson did not share the same supervisor. It may be that when different decisionmakers or supervisors are involved in the respective employment decisions, employees are not considered similarly situated. *Vasquez*, 349 F.3d at 641, n.17. But "[s]imilarity between two persons or groups of people is a question of fact that cannot be mechanically resolved by determining whether they had the same supervisor without attention to the underlying issues." *Hawn*, 615 F.3d at 1158 (noting that individuals with different supervisors could be similarly situated because the relevant decisionmaker, the organization's president, was aware of the underlying facts for both groups, but affirming summary judgment on an independent ground). In this case, the Board, which had managed Watson's departure, was aware of Karthauser's situation because the Board's personnel committee consulted with and agreed with Fletcher while he was preparing to place Karthauser on leave and terminate her employment. These decisionmakers were not so independent to remove the question from the jury of whether Watson and Karthauser were sufficiently similar.

It is also irrelevant on this point that Karthauser was replaced by a woman and that McClafferty was eventually fired. A jury could still find that C911's handling of Karthauser's termination indicates that women at C911 face harsher treatment in pre-termination procedures, yielding unfair employment practices. Because Karthauser presents specific and substantial evidence creating a genuine dispute as to material facts that both her termination and referral for

prosecution were discriminatory, the Court denies C911's motion for summary judgment on

Karthauser's claim of sex discrimination.[5]

## B.  Retaliation

In her Second Claim for Relief, Karthauser brings retaliation claims under Title VII, the

Equal Protection Clause, and ORS 659A.030(1)(f). These claims are based on allegations that

C911 terminated and referred Karthauser for criminal prosecution because she opposed Watson's

sex discrimination.

### 1.  Title VII Retaliation and ORS 659A.030(1)(f)

Title VII retaliation is analyzed under the same burden shifting framework as Title VII

discrimination. *See Brooks*, 229 F.3d at 928. To establish a prima facie case of retaliation under

Title VII, a plaintiff must show that (1) she engaged in a protected activity, (2) she suffered an

adverse employment action, and (3) there was a causal link between her protected activity and

the adverse employment action. *Id.*; *see also Villiarimo*, 281 F.3d at 1064.

Karthauser also brings a state law sex discrimination retaliation claim under ORS

§ 659A.030(1)(f). Courts analyze these retaliation claims together with Title VII retaliation

claims because "[t]he elements of a *prima facie* case under ORS § 659A.030(1)(f) are

substantially similar" to those for retaliation under Title VII. *Meyer v. State ex rel. Or.*

---

[5] In support of her pretext argument, Karthauser also presents evidence of a BOLI substantial evidence determination. C911 argues that BOLI's statements are inadmissible hearsay because they are merely preliminary conclusions that sufficient grounds exist for the continuation of an administrative process. *See, e.g.*, *H.K. v. Keiper*, 305 Or. App. 606, 613-15 (2022) (explaining that admission of BOLI documents, including the investigator's final report, was erroneous, even for the limited purpose of notice and knowledge); *Sleigh v. Jenny Craig Weight Loss Centers, Inc.*, 161 Or. App. 262, 266-67 (1999) (concluding that admission of BOLI report was erroneous because it is inadmissible under Rule 803(8)(c) of the Oregon Evidence Code). The Court need not consider the BOLI opinion, however, because Karthauser presents other evidence of pretext sufficient to deny summary judgment.

*Lottery*, 292 Or. App. 647, 678 (Or. App. 2018); *see also Portland State Univ. Chapter of Am. Ass'n of Univ. Professors v. Portland State Univ.*, 352 Or. 697, 712 (2012) ("Title VII also contains an antiretaliation provision that is analogous to ORS § 659A.030(1)(f) . . . .").

### 2.  Application

#### a.  Prima Facie Case

C911 does not dispute that the termination of Karthauser's employment and the referral for prosecution are adverse employment actions. C911 argues that Karthauser fails to meet her burden to prove a prima facie case of retaliation under the first and third prongs, in that Karthauser did not engage in a protected activity and that, even if she did, there was no causal link between her protected activity and the adverse employment actions.

#### i.  Protected activity

On the first element of a prima facie retaliation case, Title VII protects the opposition to or reporting of unlawful discrimination. "[T]he plaintiff must make some showing sufficient for a reasonable trier of fact to infer that that the defendant was aware that the plaintiff had engaged in protected activity." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003). "Protected activity" in the retaliation context includes the filing of a charge, filing of a complaint, or providing testimony on an employer's alleged unlawful practices. *Id.* "Depending on the circumstances, reports of improper workplace behavior can be protected activity under Title VII." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 962 (9th Cir. 2009). Protected activity also includes other activity intended to oppose an employer's discriminatory practices. *Raad*, 323 F.3d at 1197.

C911 argues that Karthauser fails to make out a prima facie case of retaliation because Karthauser did not "oppose" what she reasonably believed to be unlawful sex discrimination when she participated in Reeves's investigation into the charge of Watson's sexual harassment.

Instead, C911 claims, Karthauser "merely" told Reeves that Watson had asked out both Karthauser and another employee.

Karthauser need not have initiated the complaint to oppose unlawful conduct. "[A] person can 'oppose' by responding to someone else's question just as surely as by provoking the discussion . . . ." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 277 (2009). "The mere fact that an employee is participating in an investigation or proceeding involving charges of some sort of discrimination, however, does not automatically trigger" retaliation protections. *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988) "[T]he underlying discrimination must be reasonably perceived as discrimination prohibited by Title VII." *Id.* That is, "the opposed conduct must fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation." *Id.* Whether that conduct can be reasonably perceived as discrimination is an objective, not subjective standard. *Bessler v. City of Tempe*, 2021 WL 3089104, at *6 (D. Ariz. 2021) (addressing retaliation under the ADEA, citing *Learned*, 860 F.2d at 932; *Maner v. Dignity Health*, 350 F. Supp. 3d 899, 909 (D. Ariz. 2018), *aff'd*, 9 F.4th 1114 (9th Cir. 2021)).

C911 cites *Learned* in arguing that Karthauser did not oppose protected conduct. In *Learned*, the plaintiff reported discrimination based on physical and mental limitations, which is not covered under Title VII. "Learned did not allege that he ever opposed any discrimination based upon race, color, religion, sex, or national origin." *Learned*, 860 F.2d at 932. As a result, Learned could not claim retaliation for opposing discrimination prohibited by Title VII. *Id.*; *see also Jamal v. Wilshire Mgmt. Leasing Corp.*, 320 F. Supp. 2d 1060, 1079 (D. Or. 2004) ("There is no evidence in the record that illegal discrimination was ever mentioned."). Karthauser, however, spoke to Reeves about Watson's potential sex discrimination and harassment, which

are illegal under Title VII. Karthauser meets the objective standard in *Learned* by reporting

sexual harassment to Reeves.

      Moreover, construing the evidence in the light most favorable to the nonmoving party,

the evidence Karthauser presents is sufficient to demonstrate that she reasonably believed, when

she spoke with Reeves, that Watson's conduct in the workplace violated laws and regulations

against sexual harassment and sexual discrimination. Karthauser knew that Watson engaged in

inappropriate advances towards women in the workplace because he had approached her, and

knew of laws prohibiting sexual harassment and sexual discrimination in the workplace.

Karthauser recalls:

> I disclosed to [Reeves] that Watson asked me out and that I
> rejected him. I told Reeves what I knew about Watson's advances
> toward Ms. Turula and his treatment of Trish Hilsinger in the
> workplace as though they were romantically involved. I was aware
> of laws prohibiting sexual harassment and sexual discrimination in
> the workplace. I believed that Mr. Watson's conduct in the
> workplace violated laws and regulations against sexual harassment
> and sexual discrimination.

ECF 60 at 14 (Karthauser Decl. ¶ 37). Based on this evidence, a jury could reasonably conclude

that Karthauser believed Watson's behavior was unlawful when Karthauser disclosed that

behavior to Reeves.

      C911 also suggests that Karthauser did not "oppose" Watson's discriminatory actions by

disputing whether Karthauser *disapproved* of the behavior she reported. "[T]his argument fails

not only because at the summary judgment stage we must 'view all facts and draw all reasonable

inferences in [Karthauser's] favor,' but also because [Karthauser] gave no indication that

[Watson's conduct] was anything but offensive to her." *See Crawford*, 555 U.S. at 277 n.2

(quoting *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004) (per curiam)). The Reeves Report

relays that Karthauser did not think Watson would retaliate against her coworkers because "he is

not that kind of person." But Karthauser expressed no approval or defense of Watson's actions. This evidence, read in the light most favorable to Karthauser, would not preclude a reasonable jury from finding that she "opposed" Watson's behavior. Thus, Karthauser's interview with Reeves is protected activity under Title VII.

### ii. Causation for termination

C911 next argues that Karthauser does not show evidence of the third element of a prima facie retaliation claim. This element requires a causal link between her protected activity and the adverse employment action. The employee must adduce evidence sufficient to raise the inference that her protected conduct was a *but-for* cause of the alleged adverse action by the employer. *See Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 362-63 (2013) ("The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."); *see also Westendorf v. W. Coast Contractors of Nevada, Inc.*, 712 F.3d 417, 422 (9th Cir. 2013) ("To make out such a claim, [the plaintiff] had to show that her protected conduct was a but-for cause—but not necessarily the only cause—of her termination."). But "[e]ssential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity." *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).

C911 argues that Karthauser cannot demonstrate causation because Fletcher did not know about Karthauser's conversation with Reeves. C911 also contends that Karthauser's conversation with Reeves and eventual termination were more than a year apart, and therefore she cannot show a but-for link between her protected activity and the termination of her employment.

Karthauser, however, does not rely on temporal proximity as evidence of causation. She provides circumstantial evidence and argues that it is a reasonable inference that Watson must have informed Fletcher about what Karthauser told Reeves and that Fletcher acted with a

retaliatory motive.[6] The Court finds Karthauser's circumstantial evidence and reasonable inferences regarding Fletcher and Watson sufficient to show causation at the prima facie stage for several reasons.

First, Karthauser's evidence supports a finding that Watson was aware of Karthauser's statements. The Reeves Report was presented to the Board in a meeting on April 21, 2017. Watson was present and received a copy of the Reeves Report. On the day of Watson's resignation, he called Karthauser into his office and told her that he was angry with her because the report made him look dishonest during the investigation, when he had denied asking out Karthauser. He also blamed her for the loss of his job.

Next, Karthauser's evidence would allow a reasonable jury to find both that Watson likely told Fletcher about Karthauser's statements to Reeves and that Fletcher was biased in favor of Watson. Fletcher has known Watson since about 2012. As noted, in text messages between Watson and Fletcher, Watson refers to Fletcher as "good friend" or "friend," and Fletcher refers to Watson as "my man." They have gone out to dinner several times and to lunch several dozen times. They have worked three-week side jobs together in San Diego as security guards. Watson has shared personal information with Fletcher, such as details about Watson's separation from his wife and that the sexual harassment investigation played a role in Watson's divorce. In conversations during Fletcher's onboarding, Watson told Fletcher about why he resigned, the nature of the investigation against him, and the Reeves Report. Watson also communicated with Fletcher regarding Blitz's investigation into Miller and the decision to

---

[6] Karthauser also argues that the Board, Blitz, and other employees knew about Karthauser's comments to Reeves. Karthauser does not explain how this knowledge translates into *Fletcher's* knowledge, or provide evidence or argument that any of these persons informed Fletcher about Karthauser's protected conduct.

prosecute Miller. Fletcher also met regularly with Watson and attended Board meetings even before Fletcher joined C911 as its Executive Director, including during the investigation into Watson.

It is also a reasonable inference that Watson and Fletcher discussed Karthauser during the morning of June 6, 2018, when Fletcher met with Watson. By that morning, Fletcher was already generally aware of complaints about Karthauser from his meeting with the "spokesperson" who raised the issue on behalf of Fletcher's team, and Fletcher knew that those complaints would be the subject of his off-site meetings with his employees later that day. Fletcher had reached out to Blitz on May 30, 2018, to give him advance notice of a potential personnel issue with Karthauser. Also, immediately after the June 6 meetings, Fletcher contacted Board member Rob Anderson and told him that Karthauser should be placed on administrative leave before any investigation. At deposition, both Fletcher and Watson said they were unable to recall what was said during their meeting on June 6th.

Finally, Plaintiff presents an email exchange following the termination of Karthauser's employment. On August 1, 2018, Fletcher emailed C911 staff providing an update on "recent developments surrounding the departure of Diana Karthauser and the reasons behind the departure." The email advised staff that the police were investigating, that staff receiving the email are not "targets," and their participation was voluntary, but provided no other context regarding the nature of the investigation. Four minutes later, Fletcher forwarded this email to Watson, adding that Fletcher suggested to the Detective that there might be "some interest in him speaking with [Watson] to cover any issues or pertinent things that may be germane to this investigation." Watson responded that he would do his best if contacted. This email exchange suggests that Fletcher and Watson had been discussing Karthauser, because Fletcher provides no

explanation or context for what is going on and Watson responds without asking for any explanation. It also suggests that Watson likely had already revealed the contents of the Reeves Report; without that connection, Watson is irrelevant given that Karthauser's alleged criminal conduct occurred after Watson was no longer supervising Karthauser. With no other logical reason for Fletcher to inform or involve Watson in the criminal investigation, a jury reasonably could conclude from this email that Fletcher was talking to Watson about Karthauser before August 1, 2018, that Watson already knew the context for the criminal investigation, and that he likely had said something to Fletcher about his experience with Karthauser, including her statements to Reeves. There would be no reason to tell Watson only the end of the story unless he already knew the beginning.

In sum, even without direct evidence of a conversation between Fletcher and Watson about Karthauser, Karthauser's circumstantial evidence, when viewed in the light most favorable to her, is enough to create a triable issue that Karthauser's report of Watson's unlawful conduct and Karthauser's termination are sufficiently causally connected. Karthauser has produced evidence of specific scenarios during which it is a reasonable inference that Fletcher learned of Karthauser's protected conduct. *See Emeldi v. University of Oregon*, 698 F.3d 715, 728-29 (9th Cir. 2012) (holding that because an employee debriefed the decisionmaker about a discussion in which the plaintiff had made a protected complaint, a jury could reasonably infer that the decisionmaker was aware of the complaint despite the employee's denial). Karthauser meets the minimal burden of establishing her prima facie case of retaliation for her *employment termination*.

### iii.  Causation for referral to prosecution

Karthauser also claims as an adverse employment action her referral for prosecution. C911 contends that Blitz unilaterally made the decision to refer Karthauser's conduct to the

district attorney's office and that it was not causally connected to Karthauser's protected conduct. Karthauser first challenges whether Blitz made the referral. Karthauser points to the following exchange at Blitz's deposition:

> Q.     You made the ultimate decision to report Miss Karthauser's actions to law enforcement as a crime. Right?
>
> A.     Let's -- let's be real clear. No, I could care less whether she's prosecuted or not. Never did care. Still don't.

ECF 61-42 at 44 (Blitz Dep. 223:20-25). Blitz previously explained at deposition that he did not see referring Karthauser's case as making a "criminal complaint," but felt that it was C911's "duty, [and] by extension [his] duty" to notify the district attorney's office of the conduct and "facilitate" the district attorney's review and decision. Karthauser argues that Blitz's testimony is inconsistent and creates a credibility issue for the jury. Karthauser asserts there is an issue of fact regarding who made the decision to report her for prosecution, but generally contends that "Blitz and Fletcher decided to seek a criminal investigation of Karthauser."[7]

      The Court does not find Blitz's deposition statements to be inconsistent. Blitz's statement that he did not report a "crime" is not inconsistent with his statement that he felt obligated to forward Karthauser's file for the district attorney's office to consider. He reported underlying conduct and left it to the district attorney's office to determine whether it was a crime.

      Karthauser next points to evidence that Blitz read the Reeves Report and knew of Karthauser's protected activity. Mere knowledge of a protected activity, however, is not enough to establish a causal connection. *See Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751 (9th Cir. 2001) (discussing retaliation in the First Amendment context). Karthauser must

---

      [7] Although Karthauser briefly references Fletcher along with Blitz in the decision to seek a criminal referral, Karthauser does not argue a "cat's paw" theory of liability, nor did she plead such a theory. Thus, the Court does not analyze whether she can base causation on such a theory.

also present evidence sufficient to raise the inference that her protected activity was the but-for cause of the adverse action, such as temporal proximity or evidence of retaliatory or discriminatory animus by the decisionmaker. *Id.* at 751-52. Karthauser fails to do so. The Court grants summary judgment to C911 with respect to Karthauser's retaliation claims based on the criminal referral. Thus, the Court considers pretext only for C911's termination of Karthauser's employment.

### b.  Pretext

Because retaliation claims under Title VII are governed by essentially the same burden shifting framework as discrimination claims, the Court's analysis on Karthauser's discrimination claim is instructive for the second and third steps. The Court notes that C911 professes a nondiscriminatory reason for Karthauser's termination, but Karthauser argues this reason is pretextual. Causation and pretext inquiries are often overlapping. *Emeldi*, 638 F.3d at 729-30. But Karthauser must still meet her burden of providing "specific and substantial" evidence that C911's professed nondiscriminatory reason is pretextual. *Aragon*, 292 F.3d at 661.

The evidence of Fletcher's departure from C911's disciplinary policies when handling Karthauser's termination, excessive response, and different treatment for similarly situated individuals, as discussed in the context of discrimination, leads the Court to a similar result when considering her retaliation claim. Moreover, from the evidence of Fletcher's potential retaliatory motive, discussed in the context of causation, a reasonable jury could conclude that Fletcher already had the conclusion in mind to fire Karthauser before any investigation, based on his personal animus. This is supported by the fact that he alerted Blitz before Fletcher even spoke with his team to hear the details, that he held a meeting with Watson the same day he had scheduled the meeting to speak with his staff about Karthauser, that he placed her on administrative leave before any investigation, and the August 1st email exchange between

Fletcher and Watson, which indicates that Fletcher was talking to Watson about Karthauser's personnel issues, as discussed *supra*. Karthauser also received different and more harsh treatment than did Watson and McClafferty. A jury could reasonably infer that Fletcher's retaliatory motive tainted the investigation and ultimate decision. Like Dee Wooley, one of the C911 Board members present at the Board meeting on August 2, 2018, the jury could reasonably "question[] if Steve Watson is getting revenge on Karthauser through Fletcher." After viewing this evidence in the light most favorable to Karthauser, the Court denies summary judgment on Karthauser's retaliation claim based on her termination.

## C.  Whistleblowing Claims

Karthauser's Fourth, Fifth, and Eighth Claims for Relief allege unlawful retaliation for whistleblowing under ORS §§ 659A.199, 659A.203, and 659A.230. These claims are based on allegations that Fletcher terminated Karthauser, and that the district attorney initiated criminal proceedings against Karthauser, because she reported violations of the law or of criminal activity. Karthauser alleges that these violations occurred when McClafferty sought to access Karthauser's social media account and when he accessed CJIS without authorization. Karthauser argues that her reports of McClafferty's actions are protected under Oregon law.

### 1.  Whistleblower Retaliation (ORS §§ 659A.199, 659A.203, and 659A.230)

Claims for whistleblower retaliation under ORS §§ 659A.199, 659A.203 and 659A.230 are statutory claims whose elements derive from the statutes. *See Burley v. Clackamas Cnty.*, 298 Or. App. 462, 465-66 (2019) (ORS § 659A.199); *Harper v. Mt. Hood Cmty. Coll.*, 283 Or. App. 207, 211-12 (2016) (ORS § 659A.203); *Hall v. State*, 274 Or. App. 445 (2015) (discussing all three statutes). "Loosely speaking, those whistleblowing statutes prohibit employers from retaliating against an employee as a result of the employee's report of certain improper activities.

Whether the employee is protected depends upon an assessment of the employee's good faith or reasonableness attendant to that report." *Hall*, 274 Or. App. at 451.

At issue in this case is the standard of belief required at the time of reporting. The distinguishing characteristic between the statutes is that § 659A.203 requires that an employee must have had an "*objectively* reasonable belief that the public entity had engaged in unlawful conduct." *Hall*, 274 Or. App. at 454 (emphasis added). "[U]nless the trial court concludes that the record is such that no reasonable juror could find for the plaintiff on the issue, whether the employee held a reasonable belief that the employer violated the law is an issue of fact for the jury." Wa*lker v. State by & through Or. Travel Info. Council*, 367 Or. 761, 783-84 (2021).

For Karthauser's claims under §§ 659A.199 and 659A.230, however, she need only show that she had a "*subjective*, good faith" belief that she reported evidence of a violation of a law, rule, or regulation. *Hall*, 274 Or. App. at 453 (emphasis added) (discussing that ORS 659A.199 and 659A.230 have the same standard of belief). "[G]ood faith relates to what the employee knew at the time of the report, not to what might be shown later to be reasonable with the benefit of hindsight." *Id.* at 452.

### 2. Application

C911 seeks summary judgment on Karthauser's whistleblower claims, arguing that the alleged acts of whistleblowing do not qualify because there is no evidence that Karthauser believed *at the time* that she was reporting a violation of law. Without this belief, C911 argues, Karthauser fails to meet either the "objectively reasonable" or "subjective, good faith" standards for her belief that violation of law had occurred.

On the CJIS incident, the Court disagrees with C911. Karthauser has presented evidence to show that she was engaged in whistleblowing when she reported McClafferty's actions, such that a jury could find that her reports were based on an objectively reasonable or good-faith

belief that a violation of law had occurred. The standard for belief of illegality in whistleblowing claims is low—even for the more stringent "reasonable belief" standard under ORS 659A.203. It is an issue of fact for the jury unless the Court concludes that *no* reasonable juror could find for Karthauser on the evidence provided. *Walker*, 367 Or. at 783-84.

In her declaration, Karthauser asserts that she believed that a violation of law had occurred when McClafferty accessed the CJIS system. In her declaration, Karthauser states: "Based upon my training and knowledge of the proper use of the system, I believed that McClafferty's conduct violated laws and regulations. When I reported the conduct to Mr. Fletcher, he acknowledged that McClafferty's actions were a serious violation of the law." C911 argues, however, that this declaration contradicts Karthauser's deposition. In her deposition, Karthauser states that she reported McClafferty because "[h]is access was unnecessary" and it was Fletcher who said, "No, that's illegal. In fact, it's illegal." But Karthauser also states that she reported the CJIS access to Fletcher because "[McClafferty]'s not supposed to do this." These are not irreconcilably inconsistent. Based on Karthauser's training and knowledge of the CJIS system, a reasonable juror could find that she was reporting McClafferty's violation of the law, even though it was Fletcher who expressly stated that the conduct was illegal. Additionally, Karthauser reported McClafferty's conduct the same day she learned of it, further supporting that she believed his conduct was a serious offense. Viewing the evidence in the light most favorable to Karthauser, the Court concludes that the evidence could permit a reasonable juror to find that Karthauser had a reasonable and good faith belief that McClafferty had violated the law.

As for the Facebook access, however, Karthauser does not present evidence to permit a reasonable jury to find that she held a reasonable or good faith belief that McClafferty violated the law. Karthauser's declaration states that she "reported Mr. McClafferty to Nancy Edwards

for improperly requesting a password change to changing [sic] my personal social media

account." The word "improperly," construed broadly, could point toward illegality. But the text

message to Edwards states:

> So I got an email from Facebook saying I requested a password
> change to my account - I did not do that and I've reported it back
> to them - I also got an alert that Jason was on the C911 Facebook
> in messenger - wondering if he put the password change request in
> without telling me - not going to worry about it until Monday but
> wanted to give you a heads up in case you know something or the
> topic comes up - don't know if he realizes a change would go
> through my personal email and I am not ok with him having access
> to that[.]

ECF 42-8 (O'Kasey Decl. Ex. 10). Nowhere does Karthauser suggest that she believed *at the*

*time* that McClafferty had violated a law by requesting access to her Facebook account—rather,

her text message states only that she was "not ok" with McClafferty accessing her personal

account. Additionally, she states in the text that she does not know if McClafferty realizes the

change would go through her personal email account and that she is "not ok" with his access,

suggesting her belief that McClafferty might not have been aware of any potential wrongdoing

and further detracting from any inference that she was reporting McClafferty for violating the

law. Based on this evidence, no reasonable juror could find that Karthauser had a reasonable

belief or a good faith belief at the time of the text that McClafferty had violated the law with

regard to Karthauser's Facebook account. As a result, Karthauser's whistleblower claims based

on her reports of Facebook access cannot proceed.

The Court therefore considers only the evidence of Karthauser's report of unauthorized

CJIS access under Karthauser's whistleblower claims. These claims nevertheless fail because she

has not established a causal link between her CJIS-related whistleblowing activity and C911's

adverse employment actions. All three whistleblowing statutes require this causal link. *See*

*Rohrer v. Oswego Cove, LLC*, 309 Or. App. 489, 497 (2021) (requiring a causal link for claims

under § 659A.199); *Folz v. State by & through Oregon Dep't of Transportation*, 287 Or. App. 667, 677 (2017) (rejecting claim under § 659A.230 because the plaintiff failed to show the requisite causal link); *Medina v. State*, 278 Or. App. 579, 590-91 (2016) (requiring a causal link for claims under § 659A.203).

The only causal connection suggested by Karthauser is that her report of the misconduct and her adverse employment actions were close in time. Temporal proximity can stand alone as evidence of causation in retaliation contexts, but only when the temporal proximity between the employer's knowledge of the protected conduct and the adverse employment action is "very close." *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Boynton-Burns v. Univ. of Or.*, 197 Or. App. 373, 381 (2005); *see also Bell v. Clackamas Cnty.*, 341 F.3d 858, 865-66 (9th Cir. 2003). The Ninth Circuit has considered temporal proximity of several months or less sufficient to support an inference of causation. *See, e.g.*, *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009) (two-and-one-half months); *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 929 (9th Cir. 2004) (three months); *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004) (seven weeks); *Miller v. Fairchild Indus.*, 885 F.2d 498, 507 (9th Cir. 1989) (two months). But the Ninth Circuit emphasizes that "a specified time period cannot be a mechanically applied criterion, and ha[s] cautioned against analyzing temporal proximity without regard to its factual setting." *Van Asdale*, 577 F.3d at 1003 (quotation marks omitted).

Karthauser reported the misuse of CJIS systems on May 1, 2018. She was put on leave on June 11, 2018 and was terminated on July 16, 2018. Karthauser's first claimed adverse employment action, the termination of her employment, occurred two and a half months after her CJIS-related report, although the process began with her administrative leave, which occurred approximately five weeks after the whistleblowing conduct. The referral to the district attorney's

office occurred at some point near in time before Karthauser's termination. These events *could* be close enough in time as to permit a jury to infer causation without further evidence of a causal link if the Court were to apply temporal proximity mechanically. But the Court considers the factual setting of the circumstances surrounding Karthauser's report of the CJIS violation, being placed on leave and terminated, and being referred for prosecution. This includes: (1) it was Fletcher, and not Karthauser, who focused on the illegality of McCafferty's conduct; (2) viewing the facts in the light most favorable to Karthauser supports a genuine issue regarding Fletcher's retaliatory motive based on Karthauser's cooperation into the investigation of Watson, with the emphasis on Fletcher and Watson's connection, but the facts do not support any connection between Fletcher and McCafferty or reasonable inference that Fletcher was motivated to *retaliate* for Karthauser's reporting of McClafferty; and (3) there are no facts connecting Blitz, who referred Karthauser to the district attorney, to her report regarding McClafferty. The Court concludes that no reasonable juror could find a causal connection to any adverse employment action.

Because no evidence suggests that Fletcher was motivated to terminate Karthauser *because of* her complaint about McClafferty, Karthauser cannot establish a causal link. Karthauser also fails to present evidence of a causal connection between her report of McClafferty and the criminal investigation into her training records. As a result, there is no genuine issue for trial under Oregon's whistleblowing statutes. The Court grants summary judgment to C911 on Karthauser's Fourth, Fifth, and Eighth Claims for Relief.

## D.  Equal Protection

Karthauser alleges claims under 42 U.S.C. § 1983 for violating the Equal Protection Clause of the Fourteenth Amendment. These claims are based on allegations that the C911

violated the Equal Protection clause by discriminating against Karthauser because of her sex and retaliating against her for opposing sex discrimination.

## 1. Equal Protection Retaliation

The Court first considers whether a claim for retaliation for reporting sex discrimination is viable under the Equal Protection Clause. C911 asserts that this type of retaliation claim is not cognizable under the Equal Protection Clause, citing the Fourth Circuit's opinion in *Wilcox v. Lyons*, 970 F.3d 452 (4th Cir. 2020). *Wilcox* recognized that intentional sexual harassment and discrimination against public employees violates the Equal Protection Clause and is actionable under § 1983. *Id.* at 458. The court noted, however, that generally there is no "equal protection right to be free from retaliation" and held that "[a] 'pure or generic retaliation claim,' however, even if premised on complaints of sex discrimination, is not cognizable under the Equal Protection Clause." *Id.* at 458, 462. This is because "allegations [under 42 U.S.C. § 1983] that an employer subjected an employee to adverse consequences in retaliation for his speech are, at their core, free-speech retaliation claims that do not implicate the Equal Protection Clause." *Id.* at 458 (cleaned up)). The Fourth Circuit explained that if a "a public employee contends she suffered adverse consequences for expressing complaints or reporting discrimination to her employer, her claim arises under the First Amendment." *Id.* at 462. On the other hand, if a public employee "links an alleged retaliatory action to her gender, that allegation would constitute part of an equal protection discrimination claim, not a freestanding retaliation claim." *Id.*

Karthauser contends the former—that she suffered adverse consequences for *reporting* Watson's conduct to Reeves. The basis of her claim is that she was retaliated against for her cooperation with the investigation into Watson and Watson's relationship with Fletcher that biased Fletcher against Karthauser. Whether this type of retaliation claim is cognizable under the Equal Protection Clause in the Ninth Circuit is less clear. "No Ninth Circuit or U.S. Supreme

Court case has held that a retaliation claim *cannot* be brought under the Equal Protection Clause." *Garrett v. Governing Bd. of Oakland Unified Sch. Dist.*, 583 F. Supp. 3d 1267, 1277 (N.D. Cal. 2022) (emphasis added). On the other hand, "neither the U.S. Supreme Court nor the Ninth Circuit has recognized an Equal Protection Claim as *viable* under a retaliation theory like the one in this case." *Id.* at 1278 (emphasis added).

Some district courts in the Ninth Circuit agree with *Wilcox* that a § 1983 claim of disparate treatment stemming from retaliation implicates only the First, not the Fourteenth, Amendment. *See Mazzeo v. Gibbons*, 2010 WL 4384207, at *5 (D. Nev. Oct. 28, 2010) ("The Court concludes that [Plaintiff's] allegations impermissibly combine her First Amendment Retaliation and Fourteenth Amendment Equal Protection claims."), *aff'd sub nom. Mazzeo v. Young*, 510 F. App'x 646 (9th Cir. 2013); *Occhionero v. City of Fresno*, 2008 WL 2690431, at *8 (E.D. Cal. July 3, 2008) ("[A] claim of different treatment in retaliation for speech is a First Amendment claim which does not invoke the Equal Protection Clause."), *aff'd*, 386 F. App'x 745 (9th Cir. 2010); *Knox v. City of Portland*, 2006 WL 2233482, at *3 (D. Or. Aug. 3, 2006) ("[T]his court concludes that Plaintiff is precluded from bringing a retaliation claim under 42 U.S.C. § 1983 based on alleged violations of her Equal Protection rights.").

In addition, several federal appellate courts from other circuits agree that retaliation claims under § 1983 based on reports of discrimination are not viable under the Equal Protection Clause. *See Garrett*, 583 F. Supp. 3d at 1277 n.6 (collecting cases from the Tenth, Fourth, Eleventh, Seventh, and Second Circuits[8]). These circuits follow the reasoning described in *Wilcox*, that the allegations of such retaliation are at their core free-speech retaliation claims. The

---

[8] The Second Circuit later superseded the case cited by *Garrett* and adopted the minority view that retaliation claims may be brought under the Equal Protection Clause. *See* note 9, *infra*.

Ninth Circuit, in a recent unpublished opinion, also rejected an Equal Protection claim "because it amounts to a First Amendment retaliation claim." *Doe v. Pasadena Unified Sch. Dist.*, 810 F. App'x 500, 502 (9th Cir. 2020). The court explained that because the adverse consequence was in response to a "threat to complain about [the defendant's] school lunch policy," it "should be analyzed under the rubric of the First Amendment." *Id.*; *see also Evans v. County of Nevada*, 2022 WL 298114 (E.D. Cal. Feb. 1, 2022) (holding that equal protection retaliation claims are "not viable" and referencing the ruling in *Doe*). Karthauser has not alleged a First Amendment retaliation claim in her Complaint.

Some district courts in this circuit, however, suggest the viability of a Fourteenth Amendment retaliation claim under the Equal Protection Clause. *See, e.g.*, *Lilly v. Univ. of Cal.-San Diego*, 2022 WL 11337682, at *9 (S.D. Cal. Oct. 19, 2022) (distinguishing *Wilcox* because the claims at issue in *Lilly* were not "pure retaliation" claims but included allegations of both discrimination and retaliation, and noting that in the Ninth Circuit retaliation claims under the Equal Protection clause might exist); *Ballou v. McElvain*, 2020 WL 1904062, at *4 (W.D. Wash. Apr. 17, 2020) (recognizing that whether an Equal Protection retaliation claim may be viable "is a close question," but finding such a claim "plausible" in the absence of a Ninth Circuit or Supreme Court opinion holding otherwise), *remanded for clarification*, 29 F.4th 413 (9th Cir. 2022).

The Court is not persuaded by *Lilly* and *Ballou*. Nor is the Court persuaded by the three cases cited by Karthauser or by *Thomas v. City of Beaverton*, cited in *Lilly*, in which the Ninth Circuit applies what *Wilcox* summarizes—considering as an equal protection discrimination case when a plaintiff alleges retaliatory conduct based on a protected class, as compared to based on reporting discrimination. These Ninth Circuit cases do not discuss the viability of a retaliation

claim for *reporting* discrimination under the Equal Protection Clause or the many circuit court cases holding that such claims are more appropriately brought as First Amendment retaliation claims. Because the viability issue did not appear to have been disputed and was not addressed by the Ninth Circuit in these cases, the Court does not find them persuasive on the question of whether retaliation claims are viable under the Equal Protection Clause. Additionally, although unpublished, the *Doe* opinion recently addressed the question and provides some guidance from the Ninth Circuit that equal protection retaliation claims like Karthauser's are appropriately brought under the First Amendment and not the Equal Protection Clause.

Karthauser cites the Second Circuit's[9] opinion in *Vega v. Hempstead Union Free School District*, which held that a state employee may bring a retaliation claim under § 1983 against a supervisor who, acting under color of law, retaliates against him for opposing discrimination in the terms of his employment. 801 F.3d 72, 82 (2nd Cir. 2015). The Second Circuit explained that there are differences between a Title VII retaliation claim and an Equal Protection retaliation claim and concluded that both claims need to be available. *Id.* at 81-82. The court in *Vega*, however, did not discuss a First Amendment retaliation claim or the circuit court cases that hold that an Equal Protection retaliation claim should be viewed as a First Amendment retaliation claim.

This Court does not find persuasive the reasoning of *Vega* and instead finds persuasive the reasoning of the many circuit and district courts that have confronted Equal Protection

---

[9] The Second Circuit previously held that retaliation claims were not viable under the Equal Protection Clause. *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996). It then held that such claims were viable, without discussing *Bernheim*. *Hicks v. Baines*, 593 F.3d 159, 171 (2d Cir. 2010). In *Vega*, the Second Circuit resolved the conflict between *Bernheim* and *Hicks*, and concluded that retaliation claim under the Equal Protection Clause were a viable alternative to Title VII.

retaliation claims based on protected conduct of reporting unlawful behavior and found them to be at core a First Amendment retaliation claim. This is because the challenged conduct (the retaliation) is not "because of" the person's protected status under the Equal Protection Clause—such as sex or race—but is "because of" the protected conduct, which is, at its core, speech. As such, the Court finds that equal protection claims based on this type of retaliation are "not viable," *see Evans*, 2022 WL 298114 at *3, and grants summary judgment on this portion of Karthauser's claim.

### 2. Equal Protection Discrimination and Entity Liability

Karthauser also brings a claim under § 1983 asserting that C911 violated the Equal Protection Clause by discriminating against Karthauser because of her sex. C911 is a communications district that provides emergency communications services for public agencies located throughout Columbia County. Local governmental bodies like communications districts "may not be held vicariously liable for the acts of its employees under the doctrine of *respondeat superior*." *United States v. Cnty. of Maricopa, Arizona*, 889 F.3d 648, 652 (9th Cir. 2018); *see also Monell v. NYC Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Instead, a local governmental body may only be held liable under § 1983 "if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quotation marks omitted). Therefore, persons who seek to hold a local government liable under § 1983 must show that "action pursuant to official municipal policy caused their injury." *Id.* (quotation marks omitted). Thus, the Court must determine whether Karthauser sufficiently shows that C911 may be held liable under § 1983 for sex discrimination.

A municipal body may be held liable in one of three ways: (1) "if it acted pursuant to an expressly adopted official policy"; (2) "based on a longstanding practice or custom"; (3) "if the

individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 883 (9th Cir. 2022) (quotation marks omitted).[10] The Court considers municipal liability for the two adverse employment actions, termination of employment and referral for criminal prosecution.

### a. Termination

Karthauser argues that the decision to terminate her employment was made by the Board, who had final policymaking authority, because the Board "participated" in the decision. Karthauser argues, alternatively, that the Board ratified Fletcher's decision. Whether Karthauser's evidence speaks to the Board's participation, Karthauser does not show that the Board made the actual decision to terminate her employment. C911's evidence, by contrast, proves that Fletcher, not the Board, decided to terminate Karthauser's employment. As a result, Karthauser cannot establish municipal liability by a final policymaker. *See Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986) (holding that this type of municipal liability only attaches where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question").

Regarding ratification, Karthauser argues that the Board ratified Fletcher's decision to terminate her employment. The Ninth Circuit has explained,

> To show ratification, a plaintiff must show that the authorized policymakers approve a subordinate's decision and the basis for it. The policymaker must have knowledge of the constitutional violation and actually approve of it. A mere failure to overrule a

---

[10] There are additional, albeit rare, methods in which these avenues of municipal liability may be shown, such as failure to train, but those are not applicable in this case.

subordinate's actions, without more, is insufficient to support a
§ 1983 claim.

*Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004) (citation and quotation marks omitted).

"Ratification, however, generally requires more than acquiescence." *Sheehan v. City & Cnty. of*

*San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd in part on other grounds, cert.*

*dismissed in part sub nom. City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600

(2015) (reviewing for "evidence in the record that policymakers made a deliberate choice to

endorse" the underlying decision (quotation marks omitted)). "Ordinarily, ratification is a

question for the jury." *Christie v. Iopa*, 176 F.3d 1231, 1238-39 (9th Cir. 1999). "However, as

with any jury question, a plaintiff must establish that there is a genuine issue of material fact

regarding whether a ratification occurred." *Id.* at 1239.

 As evidence that the Board approved of Fletcher's decision to terminate her employment,

Karthauser recounts Fletcher's statements from the July 16, 2018 termination meeting:

> [H]e told me, "in case I was wondering," the Board was fully
> informed throughout the process of terminating my employment.
> He said he had spoken with Henry Heimuller and Rob Anderson,
> (the C911 Personnel Committee), and they wanted him to inform
> me that the entire Board was in unanimous agreement with the
> decision to terminate me.

ECF 60 at 4 (Karthauser Decl. ¶ 12). Karthauser's evidence that the Board was "fully informed"

throughout the process of terminating Karthauser and that a unanimous Board agreed with the

decision to terminate her appears to create an issue of fact as to Board approval.[11]

---

[11] C911 argues that Board "approval" requires a formal, public vote in accord with ORS §§ 192.610 to 192.690. The only authority C911 cites for this proposition, however, does not support its point. *See, e.g.*, *McLean v. Pine Eagle Sch. Dist., No. 61*, 194 F. Supp. 3d 1102, 1119 (D. Or. 2016) (finding no entity liability because a number of school board members testified that they had no *knowledge* of the violation before it occurred, not because the board lacked a formal vote).

C911, however, also argues that Karthauser has not presented evidence that the final

policymaker approved the decision knowing the discriminatory basis for that decision. C911

cites, among other cases, *Ellins v. City of Sierra Madre*, 710 F.3d 1049 (9th Cir. 2013). In *Ellins*,

the Ninth Circuit affirmed the grant of summary judgment on claims of municipal liability under

*Monell* because the plaintiff did not show that the final policymaker alleged to have ratified the

conduct acted with knowledge of the improper motive of the plaintiff's supervisor who engaged

in the alleged wrongdoing. *Id.* at 1066; *see also id.* at 1066-67 (describing *Christie* as requiring

that a "plaintiff must adduce evidence that the final policymaker approved both a subordinate's

decision and the improper basis for that decision to survive summary judgment on a ratification

theory"); *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996) ("[T]he city would not be liable

because Hill has simply presented no evidence that White approved of *the basis* for Clifton's

actions: the improper motives." (emphasis in original)).[12]

---

[12] C911 also argues that entity liability through ratification can be established only if the policymaker knew that the decision was *unconstitutional* before approving it. C911 misunderstands the proper standard. To clarify, the policymaker must approve a subordinate's decision and the basis for it. The policymaker must know about the specific constitutional violations—meaning, the specific act or decision alleged to have violated the constitution. *See Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996) ("We have found municipal liability on the basis of ratification when the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation."). The policymaker, however, does not need to know that the specific act or decision, or the basis for it, violates the U.S. Constitution. As previously noted, the policymaker, must be aware of the retaliatory, discriminatory, or other improper motive behind the decision. *See Ellins*, 710 F.3d at 1066-67; *see also Waters v. City of Chicago*, 580 F.3d 575, 584-86, 586 n.2 (2009) (rejecting cat's paw under *Monell* because the final policymaker must have knowledge of the improper motive). A municipal policymaker, however, who "accept[s] and approve[s] [decisions] without ever questioning [the decisionmaker] as to their propriety" runs the risk of "ratif[ying] the misconduct" because "[m]unicipal decisionmakers may not insulate themselves from liability by attempting to delegate themselves out of all responsibility." *Hammond v. Cnty. of Madera*, 859 F.2d 797, 802 (9th Cir. 1988), *overruled on other grounds by Wood v. Ostrander*, 851 F.2d 1212 (9th Cir. 1988).

The Court agrees with C911 on Karthauser's discrimination claim on this point. Karthauser presents no evidence that the Board knew that Fletcher's decision to terminate Karthauser might constitute sex discrimination. Thus, she fails to show that the Board ratified the decision with knowledge of any discriminatory basis for it. Therefore, Karthauser fails to establish entity liability for her equal protection discrimination claim based on her termination, and the Court grants summary judgment to C911 on this claim.

### b. Referral for Criminal Prosecution

Regarding her referral for prosecution, Karthauser argues that either the Board delegated its authority to Blitz, as the attorney for C911, or is liable for the decisions of Blitz because Blitz is the agent for the Board. Regarding the first argument, Karthauser may establish entity liability through proof that an official policymaker delegated policymaking authority to a specific individual. *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995). Karthauser, however, has not provided any proof showing that the Board delegated policymaking authority to Blitz.

Regarding the second argument, that because Blitz is the attorney for the Board, he is the agent for the Board and essentially steps in the shoes of the Board, Karthauser relies only on the general obligations of attorney and client and references specific ethical rules governing attorneys.[13] Karthauser reads too much into the general attorney/client relationship. Karthauser cannot base *Monell* liability as a final policymaker simply because an attorney for an organization made a decision. *See, e.g. Ryan v. Santa Clara Valley Transportation Auth.*, 2017 WL 1175596, at *10 (N.D. Cal. Mar. 30, 2017) (dismissing *Monell* claim based on allegation

---

[13] The rule under the Oregon Rules of Professional Conduct on which Karthauser relies is that attorneys have an ethical duty to "abide by a client's decision concerning the objective of representation" and "consult with the client as to the means by which they are to be pursued." Oregon RPC Rule 1.2(a).

that the general counsel of the defendant, who made the decision, was a final policymaker as unsupported and conclusory). Further, Blitz did not have the authority to determine whether Karthauser would be prosecuted or investigated criminally—that was a decision of the district attorney's office. The final policymaker must be the *final* decisionmaker. *See City of St. Louis v. Praprotni*k, 485 U. S. 112, 127 (1988) (plurality opinion) ("[T]he authority to make municipal policy [for purposes of § 1983 liability] is necessarily the authority to make *final* policy. When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." (emphasis in original; citation omitted)). Accordingly, the Court grants summary judgment to C911 on the entirety of Karthauser's Sixth Claim for Relief under the Equal Protection Clause.

**E.  Privacy Violation**

Karthauser's Third Claim for Relief alleges that C911 terminated Karthauser in retaliation for her refusal to disclose her username and password associated with her personal social media account, in violation of ORS § 659A.330(1)(e). This statute protects employees from retaliation for refusing to disclose or provide access through a username and password associated with a personal social media account. ORS §659A.330(1)(e)(B). The statute, however, contains no express private right of action, which Karthauser acknowledges.

Karthauser asks the Court to find an implied right of action. Whether under an express or implied private right of action, a plaintiff can prove a claim for statutory liability by establishing:

> (1) a statute imposed a duty on the defendant; (2) the legislature expressly or impliedly intended to create a private right of action for violation of the duty; (3) the defendant violated the duty; (4) the plaintiff is a member of the group that the legislature intended to protect by imposing the duty; and (5) the plaintiff suffered an injury that the legislature intended to prevent by creating the duty.

*Deckard v. Bunch*, 358 Or. 754, 759-60 (2016). When considering the second criterion, absent any express intent to create a private right, courts analyze the text, context, and legislative history of the statute creating the duty, in accord with the current Oregon statutory interpretation methodology, to determine whether such intent is implied. *Id.* at 760; *see also E.J.T. by & through InTRUSTment, Nw., Inc. v. Jefferson Cnty.*, 370 Or. 215, 229 (2022) (describing Oregon's framework for construing statutes).

The Court need not delve into whether the legislature intended to create a private right of action because Karthauser does not create a genuine issue of fact on statutory liability. She fails to establish the fifth criterion: that she suffered an injury that the legislature intended to prevent by creating that duty. *See Deckard*, 358 Or. at 760. Karthauser would have to show that she had been discharged because of her refusal to disclose her password or provide access to her personal Facebook account. *See* ORS § 659A.330(1)(e). Even when accepting Karthauser's account of the disputed fact on whether McClafferty requested access to Karthauser's personal Facebook page or C911's Facebook page, Karthauser fails to create a genuine issue showing causation. There is no evidence that Fletcher knew about Karthauser's text to Edwards, or otherwise knew that McClafferty had requested access to her account, when he placed Karthauser on leave or later, when he terminated her employment. Indeed, Fletcher made the decision to place Karthauser on leave the day before she sent the text. As a result, Karthauser provides no evidence of a causal connection between any refusal to grant access to her Facebook and her employment termination. Here alleged injury is not one that ORS § 659A.330 could prevent. The Court grants summary judgment to C911 on this claim.

## F.  Wrongful Discharge

Karthauser's Seventh Claim for Relief alleges that C911 committed the common law tort of wrongful discharge by terminating Karthauser's employment in retaliation for her exercise of

rights, including, but not limited to, her social media privacy rights under ORS § 659A.330(1).

Karthauser asserts that, even without a private right of action under ORS §659A.330(1), she can

bring a wrongful discharge claim for being fired for pursuing a statutory right related to her role

as an employee. *See Delaney v. Taco Time Int'l, Inc.*, 297 Or. 10, 16 (1984). For the same

reasons stated in the analysis of Karthauser's privacy violation claim, Karthauser fails to

establish evidence that she was terminated *because* she was vindicating some right related to her

social media account. No evidence supports that Fletcher terminated Karthauser's employment

because she texted Edwards about McClafferty's alleged attempt to access her Facebook

account. Because there is no genuine dispute of material fact on this point, the Court grants

summary judgment to C911 on Karthauser's wrongful discharge claim made in the alternative to

her claim under ORS § 659A.330.

Finally, any other wrongful discharge claim would be precluded by the availability of

adequate statutory remedies. *See Walker*, 367 Or. at  779 (explaining that the "common law

wrongful discharge is an interstitial tort: The tort may only be invoked when another claim does

not provide a plaintiff with an adequate remedy"); *id.* at 779 n. 4 (noting that "[g]iven the gap" in

remedies the plaintiff was able to bring both a statutory and wrongful discharge claim but that

after the Oregon legislature amended the whistleblowing statute in 2016, a plaintiff now "would

be afforded a complete remedy under the current statute and could no longer bring both a

statutory whistleblowing claim under ORS 659A.203 and a common-law wrongful discharge

claim"). The Court grants summary judgment to C911 on the entirety of the wrongful discharge

claim.

## CONCLUSION

The Court GRANTS IN PART and DENIES IN PART Defendant's motion for summary

judgment (ECF 40). The Court DENIES Defendant's motion against Plaintiff's First Claim and

DENIES IN PART Defendant's motion against Plaintiff's Second Claim. The Court GRANTS

Defendant's motion against Plaintiff's Third, Fourth, Fifth, Sixth, Seventh, and Eighth Claims

and GRANTS IN PART Defendant's motion against Plaintiff's Second Claim. This case may

proceed to trial on Plaintiff's First Claim (alleging sex discrimination in violation of federal and

state law) and on Plaintiff's Second Claim (alleging employment termination in retaliation for

opposing sex discrimination in violation of federal and state law).

**IT IS SO ORDERED**.

DATED this 28th day of December, 2022.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge